The only error assigned in the bill of exceptions is to the judgment overruling the motion for new trial, which was based on the general grounds only, going to the sufficiency of the evidence to sustain the verdict. The evidence amply supported the verdict, and having been approved by the trial judge, the judgment refusing a new trial will not be disturbed.
Judgment affirmed. All the Justices concur.
 No. 14888. JULY 6, 1944.
Elwood Gilmer and Gilbert Pulley were convicted of rape under a joint indictment; and the jury, having recommended them for mercy, fixed Pulley's sentence at a minimum of one year and a maximum of five years, and Gilmer's at a minimum of one year and a maximum of three years.
The alleged victim testified that she was eighteen years old and had just come to Columbus from Mississippi seeking work; that on the evening of November 19, 1943, she went out to supper with her cousin, another girl, and a married couple, after which they went to Clark's Place in Alabama to dance, and later to O'Neal's Place; that shortly thereafter Gilmer and Pulley came in but gave their names as Sergeant Moore and Sergeant Jenkins; that she danced with Gilmer who asked to take her home, but her cousin said not to do so; that she went to the car and told him she would like to but couldn't, and Gilmer, "If you would like to go, that is good enough to me," and pushed her into the car; that after stopping at a sandwich place they started home, and becoming uneasy she asked where they were going and he replied, "to a square dance," but it was closed, so she said, "Let's go home," but instead "they *Page 850 
drove out and turned off the road;" that "Gilmer kissed me once, and after we turned off the road felt of my breasts so I fought them." She further testified as follows: Both Gilmer and Pulley got out of the car and said "Let's get on the alert." Pulley came to the car and asked how she would like to walk home and she said she would be tickled to death at the chance, and he replied, "Hell, no, we didn't bring you out here to be walking back," and he pushed her over in the corner and got over her, and she started pushing and fighting; that she didn't fight with both hands as she couldn't whip two men; that Pulley asked her to pull off her step-ins, and she asked him if he was crazy; that she fought him and he was over her all the time and took one of his hands and put it under her back and raised her up and pulled her step-ins off himself, and then she crossed her legs, and when she wouldn't uncross them, he slapped her and uncrossed them himself; that she raised up in the seat and he told her to move down close to him and she didn't, and he slapped her again and pulled her down himself and went on "and done what he wanted to;" that she was hollering all the time, and he told her that if he saw she hadn't been bothered before, he would leave her alone; that she felt better then because she knew she hadn't, but instead of quitting he went ahead and forced himself on her, although she resisted to the utmost of her power. Then Gilmer came and she just fought them all she could and knew how to do; that Gilmer said, "You gave it to him, you are going to have to give it to me;" and she replied that Pulley took it, and Gilmer said, "I will have to take it too; it is going to be a whole lot worse on you," to which she replied, "You are crazy if you think I am going to consent," and he pulled her back into the car and he started; that she mentioned that she would hate to be pregnant, and he guaranteed that she wouldn't because he would use a rubber, and she didn't say anything else but just begged him not to do it, but he shoved her back into the corner; that there was blood on the seat and she said she didn't want to get that on her coat, and he looked and pushed her back again and started; that when he got through, Pulley came back again and she asked him not to bother her any more, and asked if he was going to use a rubber because Gilmer did, and he replied that he wasn't afraid of catching anything from me," and went on and done what he wanted to. When they were through, she used some kleenex, and Gilmer wiped off the *Page 851 
seat with his handkerchief; that they started back to town with Pulley driving, and threatened her if she told. Part of the way back they told her that she could go back and tell her friends that she wasn't a lady any more. She also testified that they took her home where her cousin was on the porch; that she first reported it to the married couple she had eaten supper with, who lived there, and others there and she wasn't home fifteen minutes until the police came. She identified the kleenex, her step-ins, the handkerchief, her coat, and the automobile seat cover referred to.
On cross-examination she testified that at Clark's Place her cousin was drunk, but she was not drinking; that it was some time after 1:30 a. m. that she left with the boys; that she had her coat on when she got in the car; that she did not scream when she was pushed into the car because she wasn't afraid of them and thought they were going to take her home, and she didn't resist Gilmer when he pushed her into the car; that when Pulley was doing what he wanted to and had her pushed down into the car, she noticed a car passing on the highway but couldn't get out, but she yelled as loud as she could and was "hollering" all the time and the car doors and windows were closed; that she didn't try to open them and couldn't if she had tried; that she didn't attempt to get out of the car and run away because she knew there wasn't any use; that Gilmer started playing with her first, and when she told him to stop he stopped and got out of the car, then Pulley came in the car and started playing with her breasts, and she told him she couldn't, and he said, "Don't tell me nobody has ever played with your breasts or they wouldn't be that big;" and she told him, "Yes, my breasts was big, that God made them big, and I was proud of them even if they were, and I told him breasts were made for babies and not men, and I told him he wasn't going to play with mine. I was fighting him and pushing him. I didn't try to whip him but I pushed him. I didn't scratch him. I slapped him but I don't know how many times. I don't know where my hands were when he put his hands under me and pushed me up to him. I tried to push him away and kept pushing him away all the time. I did everything in my power. The car was cramped and Pulley is a tall boy. Pulley was down on the floor of the car. He slapped me and uncrossed my legs. He had difficulty in pulling my legs apart; I tried to keep him from uncrossing them. I don't know *Page 852 
whether there were any blue places on my legs when he pulled them apart. I don't say there were. Both of Pulley's hands were engaged at the moment of affecting penetration and after he slapped me I reckon both of my hands were free. I did not give up. I reckon both of my hands were free when he pulled me up to him and made the insertion. The next day I had a bruise on my lip, which I showed to Mr. White and the detective. I think I showed it to Dr. Cosby. That was the only mark on my body after this thing occurred. I didn't try to get away because Gilmer was outside and because Pulley had me down and there was no use. I quit resisting Pulley after I had to. Pulley took off my step-ins and they were not torn in any place. When Pulley got out and Gilmer came in was the first time there was talk of the use of a rubber. Gilmer never did slap me. He did not scratch me. I resisted him by pushing as hard as I could. I didn't scratch him. I didn't bite him or attempt to bite him. I didn't slap him or attempt to slap him. I didn't kick him because I couldn't. I don't think I could have kicked him before he got on top of me because my feet were in the car and he pushed me and got over me. I was hollering all the time because it hurt so bad. Nobody came to my rescue. When Pulley came back in, I suggested he use a rubber because Gilmer used one. I didn't do much of anything this time because I was so weak I couldn't. All I did was talk. I didn't try to do anything physically. These boys didn't exhibit a weapon of any kind. They never threatened me; only Pulley slapped me twice. They didn't threaten to choke or harm me if I didn't give my consent. They didn't have to. They were big and strong enough. After they were through, they told me I'd better not tell it. When he left, Pulley said it was 3:30 a. m. Benning time. I told them not to say anything, because I knew a few soldiers and I didn't want them to know it. I did this because I did not want them to know I was going to tell. When we got home, Mrs. Hilbun was on the front steps just a short way from the sidewalk. I don't remember whether Mrs. Hilbun asked me where I had been. I went in the house and told them all together. I didn't stop on the porch with Mrs. Hilbun. Gilmer said good-night to me at the car in front of the house. I thought Gilmer was nice. He wasn't drinking or anything. I told Dr. Cosby the next day that I thought Gilmer was better than Pulley because he didn't slap me and he did use a *Page 853 
rubber. I liked him better on that account because he had reason for me. Pulley said he wasn't afraid he would catch anything from me and he didn't care about me. I told my father about it at Christmas for the first time. Both had sexual intercourse with me."
Dr. F. L. Cosby a witness for the state testified that he examined the alleged victim on November 20, 1943, and found she had a lacerated hymen, which is a membrane that is formed across the front of the vaginal orifice, and also a laceration of her mucous membrane right in the perineum in the base of the vagina; that the hymen was torn, lacerated, bruised and swollen and bled very easily, and it appeared that she had recently had sexual intercourse, and in his opinion this was the first time she had had intercourse on account of the laceration of the hymen and the mucous membrane of the vagina. On cross-examination he testified that he expressed no opinion as to who was the first man who ever went with her; that he examined her about 12 o'clock on the same day she told him that at 2:30 that morning she had had intercourse, which was about ten hours afterward; that he looked for bruises and had her stripped on a table with a sheet over her, but found no bruises or scratches on her body other than in the vagina itself; that she made the remark that the second one seemed to be a nicer fellow; that he used a rubber; that everything he saw was consistent with the act of sexual intercourse for the first time.
Charles M. White, a special investigator for the solicitor-general testified for the State that this affair was reported to the solicitor-general's office about 9:30 a. m., November 20; and he made an investigation, taking a statement from the alleged victim, and carried her to Dr. Cosby's office about 11 or 12 o'clock; that he then took her to where she said it took place following her directions; that she said we would find a man's pocket handkerchief with blood stains on it, which we found at the location; that she told us the position of the car as it was parked on the side road the previous night, and we found tracks to correspond, and also found kleenex with blood stains on it as she had told us; that they found the owner of the car, and from information obtained from him arrested the defendants; that the seat cover in evidence was taken from the car; that the defendants were identified from a line of twelve or fifteen other soldiers by the alleged victim, as being the men she said attacked *Page 854 
her the night before. (At this point the defendants admitted through their counsel that on the occasion in question they had had sexual intercourse with the prosecutrix.)
Jack Hayes, a witness for the State, testified that he is a patrolman with the Muscogee County police department; that at about 4 o'clock a. m. on or about November 20, 1943, a call came in to the city police; the car he was in was given a call, and they went to that address and found the prosecutrix and others at the house; that she reported she had been assaulted and was very much upset; that her face beneath her eyes was damp as if with tears; that he received from her a pair of panties that were very bloody. The articles which had been identified were introduced in evidence.
The defendant, Elwood Gilmer, in his statement to the jury, after recounting circumstances leading up to his meeting with the prosecutrix, stated that he danced with her twice and asked her to go out with them and she agreed and said she would try to get another girl for pulley, but couldn't. She wasn't drinking, but the rest of the party was, in his estimation. They went out to the car and she was called back and told she shouldn't go. She asked for a piece of paper and wrote a number, either the tag or Fort Benning registration number of the car, went back into the place, and returned stating that she was old enough to know what she wanted to do and was going whether they liked it or not; that she didn't like the party she was with, as they were all drunk; that after going by the sandwich place and to the square-dance place which was closed, it being about 2:30 a. m., Fort Benning time, they pulled off to the side of the road, and he started playing with her breasts and kissed her several times; that she took his hand off her breasts and he got out of the car and Private Pulley got in the car and stayed there ten or twelve minutes, and then came out and told Gilmer he had intercourse with her, so Gilmer then got back in the car, kissed her again, and tried to play with her breasts, but she wouldn't let him, so he put his hands down on her legs and played with her some, and she said, "I wish you wouldn't do this, you are going to get me pregnant," and he replied that he had a rubber and intended to use it; that she didn't say anything else, and when he got in the car her dress was up to here, and she didn't have her pants on; that she was sitting on the seat, and he was on his knees on the floor and he had intercourse with her in that position; that she *Page 855 
asked him to turn on the light, that there was something on the seat, which he did and noticed a dark spot on the seat which he later learned was blood; that he got out of the car, and Pulley got back in with her again and when he came back out he said he had another intercourse with her; that they took her home, and she said, "Don't tell anybody about this. I have some friends at Fort Benning myself;" that it was then ten minutes to 4, Fort Benning time; that if he had known she was a virgin, he never would have "messed with her." The defendant Pulley made a similar statement.
Robert L. Vaughn testified for the defendants as a character witness; that he loaned the car in question to Private Pulley; and that he noticed a G. I. blanket covering the seat, when he got in the car, which had not been there before. Corporal H. M. Barron testified for the defendants that, as a member of the military police, he investigated this case and saw the defendants the next day or shortly after the events related; that he did not notice any scratches or bruises about any portions of the body that he could see; that he made an attempt to see if there were any scratches on their faces or necks. Private J. C. Hall testified for the defendants that he assisted in the investigation of the defendants, saw them undressed shortly after they were arrested at Fort Benning, and did not notice any marks or scratches or bruises on their bodies. W. H. Clark testified for the defendants that he owned the dance hall known as Clark's Place, and recounted incidents there, including drinking by the party with the alleged victim, including a fight between the man in the party and a sailor; but testified that the prosecutrix was not drinking and acted like she was very much out of her place, like she was in a crowd she wasn't supposed to be in, and acted like a lady in every respect. Charlie Byrd testified for the defendants that his brother operates the dance hall known as O'Neal's Place; that he didn't remember seeing the prosecutrix there the night in question, but remembers the party, and the youngest girl screamed out, "After all everybody is a stranger the first time;" that others in the party had been drinking but were not drunk; and that the prosecutrix didn't drink any. A. V. Dunn testified for the defendants that he worked at O'Neal's Place, was there the night in question, and if anybody had screamed in the car, he would have heard it as he was within twenty feet of *Page 856 
the car, which was parked close to the window. The defendants introduced character witnesses, as did the State in behalf of the prosecutrix.